**BOSC et al. v. 39 BROADWAY, Inc., et al.**

United States District Court
S. D. New York.

Oct. 14, 1948.

Kleeberg, Greenwald & Lifflander, of New York City (Jacob Greenwald, Philip G. Gross, and Daniel Blumenthal, all of New York City, of counsel), for plaintiffs.

Myron M. Behrman, of New York City, for defendant 39 Broadway, Inc.

McInnes & Gamble, of New York City (Hamilton McInnes, of New York City, of counsel), for Fred F. French Investing Co., Inc., and Fred F. French Operators, Inc.

Nathan B. Kogan, of New York City (Samuel M. Koenigsberg, of New York City, of counsel), for Bernard D. Fischman.

George E. Netter, of New York City, for Nellie Lennan.

CONGER, District Judge.

This is an application of approval of a compromise of a stockholders' derivative action. Notice of the proposed compromise pursuant to Rule 23(c), Federal Rules of Civil Procedure, 28 U.S.C.A., was given to each preferred and common stockholder of record of the company at the close of business on February 16, 1948, and hearing on the proposal was had before me on April 21, 1948.

The action was commenced on June 5, 1946, and, before answer, the defendants Fred F. French Investing Company, Inc. and Fred F. French Operators, Inc. moved before me to dismiss the complaint on the grounds that each of the three alleged claims therein was insufficient, and furthermore was barred by the statute of limitations. Before decision was filed on the motions, the parties applied for approval of the compromise. At the time of such application, I had drafted the opinion which I proposed to file, and I deem it wise to quote it in full in support of my determination to approve the settlement made as fair and equitable to all concerned. The opinion as drafted follows:

"The defendants, Fred F. French Investing Company, Inc. and Fred F. French Operators, Inc. move to dismiss each of the causes of action of the instant complaint upon the grounds (1) that they fail to state a claim upon which relief can be granted, and (2) that the transactions complained of therein are barred by the applicable New York Statutes of Limitations. They further move to dismiss the whole complaint upon the ground that Rule 23 (b) of the Federal Rules of Civil Proce-

dure has not been complied with in that the specific allegations required to be set forth in stockholders' derivative suits are alleged merely upon information and belief and the complaint is not properly verified. Finally, defendants move, in the alternative, to strike paragraphs 47 to 54 of the complaint, in the event the third cause of action is not dismissed.

"The plaintiffs move to amend the complaint to include in their second cause of action an alternative prayer for damages for breach of contract.

"The plaintiffs, all residents of States other than New York, sue as stockholders on behalf of and for the benefit of defendant 39 Broadway, Inc. upon three causes of action.

"It appears from the complaint that on or about November 7, 1929, the defendant 39 Broadway, Inc. (hereinafter called 'Broadway') was incorporated by the Fred F. French Investing Company, Inc. (hereinafter called 'Investing') pursuant to a plan and scheme devised by Investing under which Broadway was to sell to the public its stock, consisting of 75,000 shares of 6% cumulative preferred of the par value of $100. each and 150,000 shares of common without par value. Each purchaser received in consideration of $100. a unit made up of one share of preferred stock and one share of common stock, and Investing received, in accordance with a written sealed underwriting agreement executed between Broadway and Investing, one share of common stock plus the sum of $15. for each unit sold.

"It is further alleged that by this method Investing received well over 50% of the total voting stock of Broadway, and was enabled to dominate and control Broadway, free of any voice by the investors.

"The sum of $5,285,266.88 was realized from the public marketing of Broadway's stock, $5,170,700. being received for stock fully paid and $114,566.88 representing payments on subscriptions not fully paid. 51,707 shares of preferred and 51,707 shares of common, all paid up, were issued to investors while 5,001 shares of preferred and 5,001 shares of common remained unissued awaiting completion of payment on installment subscriptions. Investing acquired, according to the agreement, sufficient common stock to match the common stock issued to the public.

"Upon the incorporation of Broadway, Investing caused the former to acquire from Fred F. French Operators, Inc. (hereinafter called "Operators"), a corporation wholly controlled by Investing, a contract for the purchase of the premises at 39 Broadway in New York City at a profit to Operators of $290,000.

"Further, it is alleged that all during Broadway's existence, Investing occupied with respect to the fund of $5,285,266.88, the affairs and activities of Broadway, conflicting positions calculated to impair its judgment as a fiduciary by acquiring voting control, permitting Operators to profit on the sale of the building, receiving commissions for underwriting the stock issue, appointing the Fred F. French Management Co., Inc. as managing agent of the building, charging fees for bookkeeping work, acquiring substantial participations in the Broadway mortgage, failing to purchase stock representing defaulted subscriptions and accepting its commission on such stock, and failing to cause the dissolution of Broadway when its financial condition became critical.

"All of these things were accomplished, it is alleged, by Investing's domination and control of Broadway through paid employees of Investing who were the incorporators of, and throughout the history of Broadway and still are, the officers and directors of Broadway.

"Upon these facts, the plaintiffs pray (First cause of action) that Investing be ordered to account for and pay $5,177,712.-77, the amount by which the fund entrusted to it through the sale of stock has been depleted.

"The second cause of action, after repeating many of the allegations of the first, demands that Investing specifically perform the underwriting agreement under the terms of which Investing underwrote and undertook to sell for Broadway, or itself purchase, for the price of $100. per unit of one preferred and one common share, so

much of the preferred and common stock as might be needed for the purchase by Broadway of the premises at 39 Broadway, the expenses of incorporation, adequate cash working capital, commissions and other expenses. 5,001 of the units so underwritten were only partly paid for by subscribers, Broadway receiving $114,566.88 as payment on account instead of the full $500,100. Which it would have received had there been no defaults. Investing, nevertheless, received its commissions on these units, and the total of $114,566.88 was at least $304,870.68 short of the amount required for the purposes set forth in the underwriting agreement.

"The plaintiffs demand that Investing purchase the 5,001 defaulted units and pay therefor the sum of $500,100.

"It is with respect to the second cause of action that the plaintiffs ask leave to amend their complaint. This will be dealt with hereafter.

"The third cause of action, repeating and realleging many of the previous allegations of the complaint, demands that Investing and Operators be required to return to Broadway the sum of $290,000. the amount of profit made from the sale of 39 Broadway by reason of the concealment and misrepresentation of the interests of Investing and Operators in the property.

"It is alleged that the directors of Broadway acted upon orders of, and under the domination and control of, Investing in accepting the assignment of the contract to purchase 39 Broadway.

"Prior to the incorporation of Broadway, Investing distributed a prospectus for the purpose of inducing the public to invest in Broadway's stock. The said prospectus allegedly misrepresented, knowingly and with intent to deceive, the amount required to pay the annual 6% dividend on the preferred stock, stated that there would be '6% dividends and return of capital' when there was no obligation to return capital, failed to disclose that Broadway was not a 'separate owing company' as stated in the prospectus, but was in fact a subsidiary of Investing, and failed to disclose Investing's interest in, and control of, Broadway.

"One of defendants' objections may be disposed of quickly.

"The complaint is verified by one of plaintiffs' attorneys, and all of the allegations are made upon information and belief.

"The defendants suggest that this is an evasion of Rule 23 (b) of the Federal Rules of Civil Procedure which requires, among other things, that ' * * * the complaint shall be verified by oath and shall aver (1) that the plaintiff was a shareholder at the time of the transaction of which he complains or that his share thereafter devolved on him by operation of law * * *.'

"But there is nothing in the Rule strictly requiring the oath of the party, and the verification itself explains that the facts are best known to the attorney verifying the complaint through participation in 'hearings conducted under Article IX of the General Corporation Law of the State of New York [McK.Consol.Laws, c. 23], looking to the dissolution of the corporatin on whose behalf the action is brought.' Moreover, Rule 99 (3) of the New York State Rules of Civil Practice permits verification to be made by an attorney if the plaintiff is not within the county where the attorney has his office. Such is the case here. And the State rule governs in default of some provision covering it in the Federal Rules. See Rule 34 of Civil Rules of the United States District Court, Southern District of New York.

"The first cause of action appears to charge, at the utmost, complete control and domination of Broadway by Investing. There are no allegations of fraud, bad faith, over-reaching or the like. There is no showing that Broadway was damaged by such domination nor that Investing's actions were other than in the interest of Broadway. True, the allegations are drawn to create an inference that Investing's conduct was wrongful, but nowhere does there appear anymore than a charge that Investing, in influencing the affairs of Broadway, acted not only in the interest of Broadway, but also considered its own.

"But it is settled that mere domination and control with no damage resulting is not wrongful. Blaustein v. Pan-American

Petroleum Transport Co., 293 N.Y. 281, 56 N.E.2d 705; Chelrob, Inc. v. Barrett, 293 N.Y. 442, 57 N.E.2d 825; Everett v. Phillips, 288 N.Y. 227, 43 N.E.2d 18. And the fact that Investing may not have acted exclusively in Broadway's interest does not create an actionable wrong. Goldstein v. Tri-Continental Corp., 282 N.Y. 21, 24 N.E.2d 728. In fact, the certificate of incorporation of Broadway expressly provided that its directors might act where they had dual interests. And such a clause is not unlawful. See Everett v. Phillips, supra. Goldboss v. Reiman, D.C. 55 F.Supp. 811, affirmed 2 Cir., 143 F.2d 594.

"The plaintiffs realize the weakness of their position but seek to support it by urging that Investing was the trustee of an express trust even though their complaint does not allege such relationship. It is obvious, however, that the dealings here did not create an express trust where there was no intention to do so. See Bogert, Trusts & Trustees, chapter 3, sections 41-52. And directors have never been held, in situations of this type, to the conduct of the strict trustee. See 3 Fletcher Cyclopedia Corporations (Perm.Ed.1943), section 838, page 146.

"I am of the opinion that the plaintiffs are not entitled to recover under the allegations comprising the first cause of action. Accordingly, it is unnecessary to consider the effect of the Statute of Limitations.

"The plaintiffs have asked for specific performance of the underwriting agreement (second cause of action) entered into between Broadway and Investing. Paragraph 8 thereof provides as follows:

" '8. The Underwriter shall and will take and pay for, at the price of One Hundred Dollars ($100.) for each share, any and all of the 75,000 shares of the said preferred stock which is not subscribed for or sold to the public, or so much thereof as may be requisite for the purpose hereinbefore set forth, and subject to the provisions of Paragraph nine hereof.'

"Paragraph 9 reserves to Broadway ' * * * the right to notify the Underwriter when the proceeds received from the subscription or sale of said preferred stock have reached a sum which shall be sufficient in amount to equal the cost of the purchase of the premises mentioned, the incorporation of the Owner, the setting up of an adequate cash working capital and of the expenses incurred by the Owner pursuant to this agreement, and underwriting commission, printing and advertisement: * * *'. It further specified that upon ' * * * such notification, the Underwriter shall not be required to take and pay for the number of shares of said preferred stock remaining unsold at the time when such notification is received by the Underwriter.'

"I find no record of Broadway ever exercising the right specified in Paragraph 9.

"It would seemingly follow, therefore, that the 56,708 shares which were sold constituted no more, and possibly less, than the amount 'requisite for the purposes' set forth in paragraph 1 of the agreement, and repeated in paragraph 9.

"Paragraph 6 provides that the underwriter shall receive commissions only on the shares underwritten. It received commissions on all of the shares sold. It is logical to infer that it underwrote them all.

"I think it proper to conclude from these provisions that the complaint states a sufficient claim for relief with respect to the underwriting agreement in its present form, i.e. specific performance, or in the form of an action for breach of contract. It remains to be seen how the Statute of Limitations affects them.

"It is settled that where both an equitable and legal remedy may be had upon the same subject-matter, the Statute of Limitations applicable to the action at law controls. Keys v. Leopold, 242 N.Y. 189, 149 N.E. 828. Both remedies are available here. Therefore, the plaintiffs' claim for specific performance of the sealed underwriting agreement would seemingly be controlled by the Statute of Limitations applying to the legal action rather than by section 53 of the New York Civil Practice Act which requires suits of an equitable nature to be commenced within ten years after the cause accrues. But an action for the specific performance of a contract under seal is not an action upon a

sealed instrument within the meaning of section 47 (Peters v. Delapaine, 49 N.Y. 362), and, therefore, section 53 applies and is a bar to the plea for specific performance because it is undisputed that all the subscriptions for the 5,001 shares were in default by January 1, 1932. The statute began running upon the defaults (Phoenix Warehousing Co. v. Badger, 67 N.Y. 294), and the Broadway stockholders might have commenced suit at that time if the directors wrongfully refused to institute the same. It was not necessary for Broadway to demand that Investing take up the subscriptions, but assuming that it was, the statute began to run at the time the right to make demand was complete. Section 15 of the New York Civil Practice Act. Such demand was complete, at the latest, by January 1, 1932.

"However, a suit for breach of the sealed underwriting agreement is timely, under section 47. That section as amended in 1941, requires that actions on sealed instruments be commenced within six years, but provides that actions accruing before September 1, 1941 receive the benefit of whatever remains of the former twenty-year period, but not in excess of six years. Assuming that the Underwriting agreement was breached on the day it was made, November 8, 1929, the expiration date would be September 1, 1947, or six years after September 1, 1941, since twenty years from the date of the agreement would be November 8, 1949.

"Accordingly, the plaintiffs' application for leave to amend their complaint to state such an action for breach of the agreement is granted. Rule 15, F.R.C.P.

"Finally, the complaint seeks the return to Broadway by Investing and Operators of the $290,000. profit allegedly made by Operators on the sale of 39 Broadway.

"The plaintiffs urge that the gravamen of the third cause of action is the actual fraud of Investing and Operators, as promotors of Broadway. It is evident, however, that fraud is asserted solely to avoid the bar of the Statute of Limitations.

"All of the allegations concerning fraud are based upon the prospectus which Investing issued to induce public subscription to Broadway's stock. The only persons directly injured by such fraud were the subscribers who acted in reliance upon the prospectus; and not one of the allegations of misrepresentation and concealment has any bearing on the profit Operators made.

"In reality, the plaintiffs seek to charge defendant with profiting secretly in the sale. It is true that promotors of a corporation are not permitted to retain the avails of a secret profit. See Davis v. Las Ovas Co., 227 U.S. 80, 33 S.Ct. 197, 57 L.Ed. 426; 1 Fletcher Cyclopedia Corporations (Perm.Ed.1943), sections 192-194.

"However, the profit here was secret only in the sense that the amount was not disclosed. Of course, the Broadway directors knew all about it, for they were employees of Investing; but assuming that the public investors were entitled to knowledge, I would be inclined to say that they had it.

"On the second page of the prospectus was the following:

"'The Fred F. French Operators, Inc., recently entered into a contract for the purchase of the above-described property and have now resold their contract to the present corporation, 39 Broadway, Inc., at a profit to said Fred F. French Operators, Inc.'

"Certainly, that statement should have been sufficient to apprise them of the fact or, at least, to put them to inquiry, if they cared. Cf. Ball v. Breed, Elliott & Harrison, 2 Cir., 294 F. 227, certiorari denied 264 U.S. 584, 44 S.Ct. 333, 68 L. Ed. 861.

"However, resolving any doubt on the point in the plaintiffs' favor, I pass to the question of the Statute of Limitations which is decisive.

"The claim for the return of $290,000. is nothing more than a simple one for money had and received. As stated before, the 'fraud' had no relation to it, and the charges in that connection were made to circumvent section 48 (1) of the New York Civil Practice Act, which provides for contract actions to be brought within six years, and gain the benefits of section 48 (5), which suspends operation of the six-year statute until the discovery of the

fraud. It is plain that the fraud is not the sine quanon of a recovery under these circumstances, and, in fact, would not be, even though the charges were germane. Brick v. Cohn-Hall-Marx Co., 276 N.Y. 259, 11 N.E.2d 902; Carr v. Thompson, 87 N.Y. 160. Section 48 (1) is properly applied, and the claim, having accrued in 1929, is barred.

"No consideration of the motion to strike is necessary in view of the above.

"Settle order in accordance with this opinion."

It may be seen from a reading of this opinion that I found merit solely in the second claim for relief.

At the hearing two stockholders appeared by attorneys and objected to the compromise. One, Bernard D. Fishman, holder of 1032 shares urged that clear liability existed under the second claim to the extent of some $2,000,000 by reason of Investing's failure to take up and pay for the shares in excess of the number sold. However, the complaint fails to assert this entire claim, but rather prays for specific performance or damages for failure to perform to the extent of $500,100, representing the total realizable on the 5,001 units upon which payments were defaulted. But the sum of $114,566.88 was paid in on these units, so this undoubtedly reduces the liability pro tanto. Paragraph 31 of the complaint makes mention of this in that the amount produced on the defaulted subscription " * * * was less by at least $304,870.68 than the amount required by 'Broadway' for the purposes referred to in paragraph '28.' "

Paragraph 28 concerns Investing's obligation to underwrite shares sufficient to cover the purchase of the building, to pay various expenses, and to provide adequate working capital. Although there was no evidence presented to me that Broadway informed Investing that the latter's obligation had been fulfilled according to these terms, it appears undisputed that the conditions were complied with; and this is apparently recognized by plaintiffs. It would seem clear, therefore, that liability could in no event exceed $304,870.68. This figure is arrived at by deducting the $114,560.88 plus $80,662.44, the latter being capital average, from $500,100; and any contingent claim over and above that figure would not be compromised by this proceeding.

French Investing has offered the sum of $130,000 to settle this litigation. This is approximately $170,000 less than might be realized by a successful prosecution of the claim. However, a trial would be necessary, and undoubtedly an appeal would ensue, and these proceedings would consume much time and entail great expense; and of course, the possibility of complete failure is ever present, even though it appears now that the claim is meritorious and not barred by the Statute of Limitations. Defendant Investing still asserts, and has always urged that it completely performed under the agreement, and it appears true that amounts in excess of what was required were subscribed.

I have given a great deal of thought to this matter. Many people lost money in this project, but as I see it this lawsuit will not help them greatly at this late date. I came to the conclusion before this matter of settlement was presented to me that at least two causes of action could not be sustained. I sustained the second cause of action only after the complaint was amended and of course in sustaining this amended cause of action I gave full faith and credit to the allegations of the complaint. It is a very intricate lawsuit. The motion to dismiss was argued before me by both sides well and with great zeal. Each side gave me voluminous, yet well reasoned briefs. The issues were fought hard and well. By and large I think it best to approve the settlement.

I have been impressed by Mr. Blumenthal, the attorney for the Stockholders' Protective Committee. This Committee of responsible men represents a great many stockholders and has for years been endeavoring to get some relief for the stockholders without success. They now feel, and express themselves through their attorney, that this lawsuit will be abortive and they recommend the settlement. I feel I should go along with them, although the money realized will be of little aid to the stockholders.

No one, with the exception of Mr. Fishman, states any specific objection to the compromise, and, as stated before, his objection was based upon the possibility of a recovery in excess of what the complaint demands, which possibility will not be included in this settlement.

So ordered.